**IN THE UNITED STATES BANKRUPTCY COURT FOR THE
EASTERN DISTRICT OF TENNESSEE**

In re

ECHO MAV, LLC
aka ECHOMAV, LLC

Alleged Debtor

Case No. 3:25-bk-31122-SHB
Chapter 7

**M E M O R A N D U M**

**APPEARANCES:**

DICKINSON WRIGHT PLLC
Stephen M. Montgomery, Esq.
424 Church Street
Suite 800
Nashville, Tennessee 37219
Attorneys for Alleged Debtor

GENTRY, TIPTON & MCLEMORE, P.C.
Maurice K. Guinn, Esq.
Post Office Box 1990
Knoxville, Tennessee 37901
Attorneys for Petitioning Creditors
Horizon31, LLC; Drones From Scratch, LLC; Rosenthal & Associates;
Brad Jones Stinson; Dustin Fuqua; Thomas Lyons

PAUL RANDOLPH, ESQ.
ACTING UNITED STATES TRUSTEE
Tiffany A. DiIorio, Esq.
Howard H. Baker Jr. United States Courthouse
800 Market Street
Suite 114
Knoxville, Tennessee 37902
Attorneys for United States Trustee

**SUZANNE H. BAUKNIGHT
UNITED STATES BANKRUPTCY JUDGE**

An Involuntary Petition Against a Non-Individual ("Involuntary Petition") was filed against Echo MAV, LLC ("Echo MAV") by Horizon31, LLC ("Horizon") on June 12, 2025. [Doc. 1.] Service of the Involuntary Petition was made on June 13, 2025. [Doc. 8.] After an evidentiary hearing spanning four days, the Court issued a bench decision on February 13, 2026, and dismissed the involuntary petition on a finding that venue was not proper in this district. [Docs. 108, 115 at 243-55.] The Court announced it would issue written findings of fact and conclusions of law concerning dismissal for improper venue and the Court's conclusion (announced with its bench decision) that Echo MAV failed to prove that the petition was filed in bad faith so that damages would not be awarded to Echo MAV under 11 U.S.C. §303(i)(2). [Doc. 115 at 256.] The Court directed in its dismissal order (1) briefing by the parties on whether 11 U.S.C. § 303(i)(1) creates a rebuttable presumption that attorneys' fees and expenses should be awarded on dismissal of an involuntary petition and (2) submission by Echo MAV of an affidavit of fees with detailed billing statements, to which the Petitioning Creditors[1] could object on reasonableness grounds and Echo MAV could reply. [Doc. 108.]

The parties filed the required post-trial briefs on whether § 303(i)(1) requires a fee award [Docs. 112, 119], and Echo MAV's counsel filed an affidavit of fees and expenses [Doc. 113], to which the Petitioning Creditors objected [Doc. 118] and Echo MAV replied [Docs. 119, 20]. The matter is now ripe for entry of the Court's findings of fact and conclusions of law[2] on (1) venue, (2) bad faith, and (3) attorneys' fees and expenses.

---

[1] The Involuntary Petition was filed by Horizon, with later joinders by Drones From Scratch, LLC ("DFS"); Larry Rosenthal & Associates, Inc., Rosenthal & Associates, L. Rosenthal and Associates, and Larry Michael Rosenthal (collectively "Rosenthal"); Brad Jones Stinson ("Stinson"); Dustin Fuqua ("Fuqua"); and Thomas Lyons ("Lyons") (collectively, "Petitioning Creditors"). [Docs. 36; 37; 46; 58; 61; 62; 63.]

[2] This decision constitutes the Court's findings of fact and conclusions of law as required by Federal Rule of Bankruptcy Procedure 7052, applicable to this contested matter through Federal Rule of Bankruptcy Rule 9014(c). Additionally, the Court takes judicial notice, pursuant to Federal Rule of Evidence 201, of all documents of record in this bankruptcy case.

The Court's conclusions turn on two rebuttable presumptions, neither of which were rebutted by the party bearing the burden. First, the Court finds that Echo MAV failed to rebut the presumption of good faith in the Petitioning Creditors' pursuit of the involuntary petition. Second, the Court concludes that the Petitioning Creditors failed to rebut the presumption that fees should be awarded to Echo MAV on dismissal of the involuntary petition. Thus, the Court will award attorneys' fees and expenses but finds that the record supports material reductions for nonlocal premium rates, block-billed and mixed-purpose work, unreasonable travel time, and excessive expert and other expenses.

## I. BACKGROUND

William Jeffrey Knowles ("Knowles") organized Echo MAV, a New Mexico limited liability company, in August 2022, and shortly thereafter hired Denny Eugene Trey Sprinkle, III ("Sprinkle") and Michael Hodges ("Hodges")[3] as managing directors. [Stips. at ¶ 1.] Sprinkle formed Echo MAV Technologies, Inc., a Texas corporation, in July 2024, and became the sole owner of Echo MAV in 2025. [Stips. at ¶ 5; Doc. 11 at ¶ 5.]

Pursuant to an Asset Purchase Agreement and a Security Agreement, both dated March 10, 2023, Echo MAV purchased Horizon's assets, consisting of "the tangible and intangible personal property [for its drone-related hardware and software] . . . including general intangibles, goods, equipment, documents, contracts, and other miscellaneous property [including proceeds and products]" for $500,000.00 cash due at closing and a Promissory Note for $1,500,000.00 ("Promissory Note"), to be paid by two $750,000.00 payments due on February 17, 2024, and

[3] Hodges (who the Court found to be entirely credible among a cast of characters who were not nearly as credible) testified that he is the President of and 50% owner of Echo MAV and has an oral agreement with Sprinkle to receive shares in EMT. Sprinkle, however, testified that as of April 2025, after buying out Knowles through a confidential agreement, he was the "sole" and 100% owner of Echo MAV.

February 17, 2025. [Stips. at ¶¶ 2, 3; Exs. S1-S4.] In April 2023, Stinson, who was a member of Horizon, became the Chief Technology Officer for Echo MAV, but left that employment as of May 20, 2025. [Stips. at ¶¶ 4, 13.] While employed by Echo MAV, in September 2024, Stinson organized BS Solutions, LLC ("BS Solutions"), a Tennessee limited liability company, changing the name of the LLC to DFS in May 2025. [Stips. at ¶¶ 7-8.] Also in September 2024,[4] BS Solutions and Echo MAV entered into a Vehicle Lease Agreement for a 1997 Toyota Land Cruiser, under which Echo MAV agreed to pay $750.00 monthly for twelve months. [Stips. at ¶ 6; Ex. S5.]

Echo MAV did not make the $750,000.00 payment to Horizon due under the Promissory Note on February 17, 2024, although it paid $80,000.00 on November 13, 2024, and $100,000.00 on November 15, 2025. [Stips. at ¶ 9.] Echo MAV also did not make the payment due on February 17, 2025, and Horizon filed an action against Echo MAV and Knowles in the Knox County Circuit Court. [Stips. at ¶¶ 10-11.] On May 21, 2025, the parties entered into an Agreed Judgment against Echo MAV and Knowles, jointly and severally, for $1,456,985.22, which included $4,600.00 for attorneys' fees. [Stips. at ¶ 12; Ex. S6.]

Horizon filed the Involuntary Petition on June 12, 2025, and was joined by DFS and Rosenthal on October 22, 2025, and by Stinson on December 4, 2025. [Stips. at ¶¶ 20-23; Docs. 36, 37, 46, 58, 61.] Fuqua and Lyons subsequently filed joinders on December 8, 2025. [Docs. 62, 63.]

## II. VENUE

Cases under Title 11 may be commenced in the district in which "the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the . . .

[4] The Stipulations state that BS Solutions was not formed until September 23, 2024, notwithstanding that the Vehicle Lease Agreement is dated September 19, 2024.

entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement . . . ," or in the court where the debtor's affiliate, general partner, or partnership's bankruptcy case is pending. 28 U.S.C. § 1408(1), (2). Because the statute is written in the disjunctive, venue is proper in any of the alternative options. *In re Acor*, 510 B.R. 588, 591 (Bankr. W.D. Tenn. 2014) (citations omitted). Nevertheless, "if a case is brought in an improper venue and an interested party timely objects, a district court has only two options: (1) dismiss the case, or (2) transfer the case to a jurisdiction of proper venue, if it be in the interest of justice." *Thompson v. Greenwood*, 507 F.3d 416, 420 (6th Cir. 2007); *see also* Fed. R. Bankr. P. 1014 (authorizing the court to dismiss or transfer a case filed in an improper venue and to transfer a case filed in a proper district "in the interest of justice or for the convenience of the parties").

"The concept of venue is based in fairness and convenience." *In re Certa Dose, Inc*., No. 21-11045 (LGB), 2021 WL 5177376, at *11 (Bankr. S.D.N.Y. Nov. 4, 2021). "Venue statutes speak to an appropriate, geographically identified forum for the effective administration of the bankruptcy process." *Montana v. Blixseth* (*In re Blixseth*), 484 B.R. 360, 365 (B.A.P. 9th Cir. 2012) (citation modified); *see also In re Certa Dose*, 2021 WL 5177376, at *11 ("It is fairness, rather than geography, that has been and should continue to be the key factor in determining the appropriateness of venue.").

In a voluntary case, "venue is 'presumed to be proper in the district where the debtor filed for bankruptcy protection.'" *Fava v. Freeman* (*In re Freeman*), 664 B.R. 334, 341 (Bankr. N.D. Miss. 2024) (citation omitted). In an involuntary bankruptcy case, the issue of venue "is best viewed in terms of deference as opposed to burden of proof," with the ultimate determination to be made by the Court. *In re Caesars Ent. Operating Co., Inc.*, No. 15-10047 (KG), 2015 WL

495259, at *5 (Bankr. D. Del. Feb. 2, 2015); *see also In re Cox Operating, LLC*, 652 B.R. 49, 56 (Bankr. E.D. La. 2023) (citing *In re Caesars Ent. Operating Co.*, and agreeing that in an involuntary bankruptcy case, "the burden is, in a manner of speaking, on the Court"); *but see In re AnthymTV Co.*, 650 B.R. 261, 275-76 (Bankr. D.S.C. 2023) (holding that, based on the agreement of the parties, the petitioning creditors bore "the initial burden" to prove venue was proper where the involuntary petition was filed, and if the court found venue was proper, the burden shifted to the alleged debtor to prove venue elsewhere was in the interest of justice and convenience of the parties). Courts also have indicated that any party challenging venue bears the burden to prove by a preponderance of the evidence why venue is improper. *In re Barrington Spring House*, LLC, 509 B.R. 587, 602 (Bankr. S.D. Ohio 2014). Thus, it is unclear who has the burden of proof concerning venue, but if the Court imposes the burden on Echo MAV, the Court finds that Echo MAV met its burden to show that venue is improper in this District.

It was established at trial that Echo MAV, which was organized under the laws of New Mexico, had offices located in Lubbock, Texas; Knoxville, Tennessee; and Colorado Springs, Colorado, and eighteen employees, many of whom worked remotely. The Texas office, which was[5] located at 6310 Genoa Avenue in Lubbock, was opened first. The office at 310 Simmons Road in Knoxville was opened approximately one year later, followed by the office in Colorado Springs. The parties have agreed that the company performed its flight testing and that only the Director of Field Operations and Director of Training were based in Colorado Springs. Thus, in the 180 days preceding the Involuntary Petition filed by Horizon on the Petition Date, Echo MAV had offices in Colorado Springs, Colorado; Lubbock, Texas; and Knoxville, Tennessee. [Stips. at ¶ 15.] Because Echo MAV's "residence and domicile" was New Mexico, the dispute

---

[5] Because the venue decision was issued several months ago, the Court has intentionally used the past tense for these findings of fact.

was whether Knoxville is Echo MAV's principal place of business or if the majority of its assets are located in Knoxville such that venue in the Eastern District of Tennessee was proper.

**A. Principal Place of Business**

What constitutes a company's principal place of business is a question of fact, with a focus on "where the debtor makes it major business decisions . . . notwithstanding the physical location of its assets or production" *In re Va. Park 1, LLC*, 672 B.R. 569, 582 (Bankr. S.D.N.Y. 2025). According to the Supreme Court, "the phrase 'principal place of business' [also known as the corporation's 'nerve center'] refers to the place where the corporation's high level officers direct, control, and coordinate the corporation's activities." *Hertz Corp. v. Friend*, 559 U.S. 77, 80-81 (2010). The Court rejected the "business activities test" – based on the amount of business conducted in a particular state – in favor of adopting and expanding the Seventh Circuit's "nerve center" test, which the Court explained is "a single place" and is "normally the place where the corporation maintains its headquarters – provided that the headquarters is the actual center of direction, control, and coordination . . . and not simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion)." *Id*. at 93. Even when "much of the management team works remotely and communications are conducted by phone or videoconference," a company's nerve center is "where the Debtor['s] decision maker . . . directs the corporation['s] strategy and activities." *In re Mountainside Coal Co*., No. 24-50161, 2024 WL 4492127, at *5 (Bankr. M.D.N.C. Apr. 19, 2024) (finding that the CEO's coordination of activities remotely from his home in Winston-Salem was "the location of direction, control and coordination of the corporation's activities," even though the debtors' business operations and assets were located in Kentucky and West Virginia).

In support of their argument that Knoxville was the principal place of business and the principal location of Echo MAV's principal assets, the Petitioning Creditors relied on Stinson's testimony that the Knoxville office consisted of 3,000 square feet, eight offices, a laboratory, a kitchen, a warehouse, and a storage mezzanine; that engineering, manufacturing, and shipping of products occurred in Knoxville; and that the notice address for the office lease and the invoice for utilities in Knoxville reflected that address. [Exs. D33, D51, D53, D56; *see also* Doc. 14 at ¶¶ 32, 33.] Stinson, who worked in the Knoxville office from September 2023 to May 2025, including six months between April 2023 and September 2023, when he worked from his home, also testified that essentially all inventory, tools, machines, and stock were located in Knoxville, and as of May 2025, seven additional people were employed through the Knoxville office, including a software lead, software engineers, mechanical engineers, a technician, and support staff. [*See also* Doc. 14 at ¶¶ 29, 31, 34.] Sprinkle likewise acknowledged during his testimony that some of the products were assembled in the Knoxville office, with other products designed in Texas. Additionally, most of the quotes and invoices showed Knoxville as the "ship to" location, and while some reflected Knoxville as the "bill to" location, the majority showed Lubbock as the "bill to" location. [*See, e.g.,* Exs. S8; S11 – S15; D42; D44; D47; D49; D54-D60; P2; P15].

Notwithstanding that business occurred out of the Knoxville office, the question the Supreme Court has directed this Court to ask is which office served as Echo MAV's "nerve center" – i.e., where its high level officers directed, controlled, and coordinated the entity's activities. To this end, Sprinkle testified – and the Court agrees– that Lubbock, Texas was Echo MAV's company headquarters. The Lubbock office included a large conference room, private offices, and storage. Both Sprinkle and Hodges were based out of the Lubbock office, as was

Echo MAV's administrative staff and its office manager, Diane Havir, who, according to Sprinkle, "d[id] everything," including "all of the administration," and "hold[ing] the place together." Employees who worked remotely reported to the Lubbock office, and all company virtual Teams meetings, except for one that occurred from Knoxville last year, had originated out of Lubbock. Lubbock was the address for the company's tax return, billing, EIN, Federal Commercial and Government Entity Code, and System for Award Management systems. [*See* Ex. S16.] Echo MAV's bank statements were also sent to Lubbock. [*See* Exs. S17-S19, S21-26.] Quotes were issued from Lubbock, and most purchase orders and invoices from customers and vendors (including some monthly recurring bills for locations outside of Lubbock), respectively, were sent to Lubbock, which also served as the notice address for the Colorado Springs lease and the address for the Colorado utilities bill. [*See, e.g.,* Exs. S8, S11 – S15; D32; D42; D44; D47; D49; D54; D55; D58-D60; P2; P15.] The internet address was registered out of Lubbock, the company phone number listed on Echo MAV's website was a Lubbock number, and all cell phone numbers for Echo MAV likewise had an 806 area code. [*See* Exs. D34, D48.] Further, the vehicle lease between Stinson and Echo MAV identified Lubbock as the company's principal address. [Ex. S5.] When Fuqua filed for unemployment benefits after he was terminated from his employment with Echo MAV, he properly filed a claim with the Texas Workforce Commission, and although he listed his employer as "Outlaw Solutions LLC," the company address of 6310 Genoa Avenue, Suite B, Lubbock, Texas 79424-2708, was the same address that was listed on Echo MAV's 2024 tax return, and Sprinkle testified that Outlaw Solutions was his company through which he processed payroll for Echo MAV. [*See* Exs. S16; P78.] Thus, it was clear to this Court that the "nerve center" for Echo MAV was Texas and not Tennessee.

**B. <u>Principal Place of Assets</u>**

The Court also found that Echo MAV's principal assets were not located in Tennessee. The preponderance of the evidence led the Court to conclude that as of June 12, 2025, the value of its tangible assets totaled $520,901.62. The Court recognized that the March 2025 inventory value exceeded $1.9 million, but the testimony also was that much of that inventory was for products that were assembled and delivered between March and May 2025. Echo MAV's *in*tangible assets (notably, not including "good will") included its independently developed drone software valued at $1,580,047.98 and the $1,500,000.00 intellectual property purchase from Horizon. Further, Sprinkle testified that the intellectual property was Echo MAV's most valuable asset, making up 60% of Echo MAV's asset value. Hodges testified similarly that Echo MAV's intellectual property formed the substantial majority of the company's assets and that the intellectual property "ha[d] a hand" in all of its products that were designed and sold.

"The location of a debtor's principal assets is also a question of fact." *In re DDMD Trucking, Inc.*, No. 14-12511-ta11, 2015 WL 321299, at *3 (Bankr. D.N.M. Jan. 28, 2015); *see also In re Shelton*, Nos. 01-20655, 01-20656, 2001 WL 35814440, at *5 (Bankr. D. Idaho Oct. 12, 2001). "Simply having an asset located in a given District is not enough" for § 1408's principal assets prong. *Id.* "The term 'principal' is not defined in the Code. But in general, use of the term as an adjective commonly connotes '[c]hief; leading; most important or considerable; primary." *Id.* (quoting *Black's Law Dictionary* 1192 (6th ed. 1990)).

For tangible items, including vehicles and equipment, the Court "should look to where the assets were physically present during the 180 days before filing." *Id.* However, "intangible property has no actual situs." *Rush v. Savchuk*, 444 U.S. 320, 330 (1980). "Determining the location of an intangible asset requires a 'context-specific analysis' that must take account of the

'functional concerns of the administration of the bankruptcy estate.'" *In re Green Jane, Inc.*, No. 2:17-bk-12677-ER, 2017 WL 2312851, at *8 (Bankr. C.D. Cal. May 26, 2017) (citing *In re Blixseth*, 484 B.R. at 367)); *see also In re Shelton*, 2001 WL 35814440, at *5 (noting that among the possible locations that can be ascribed to intangible assets "are the debtor's domicile or tax residence and the place(s) where an account or contract obligor can be pursued"). Generally, the intangible asset of "intellectual property is 'deemed to have [its] fictional situs at the residence of the owner.'" *Digital Funding, LLC v. Umpqua Bank*, No. 17-111, 2017 WL 11556411, at *1 (D. Del. Aug. 11, 2017) (quoting *Horne v. Adolph Coors Co.,* 684 F.2d 255, 259 (3d Cir. 1982) (stating that "both a state trade secret and a patent should be deemed to have their fictional situs at the residence of the owner")); *see also In re Blixseth*, 484 B.R. at 366-70 (finding that Nevada, the state in which the limited liability corporation was formed, was the proper location of its intangible property for venue purposes because Nevada statutes grant exclusive jurisdiction over the type of rights affected).

As previously stated, Echo MAV was organized under New Mexico law. Pursuant to New Mexico Statutes Annotated section 42-9-3, "the situs of intangible interests in property, real or personal, legal or equitable, shall be the place where such property is located." The Court could find no case that further defined how to know where such intangible property is located.

Relying on the cases above, the Court concluded that the location of intellectual property is the residence or domicile of the debtor. Moreover, common sense dictates that *intellectual* property is located in the mind of the owner of the intellectual property – or to put it another way, in the heart of the nerve center. The court rejected Stinson's conclusion that the intellectual property resided in the minds of the engineers in Knoxville and the argument that the UT Batelle materials the licenses for which were included in the APA were also in Knoxville because UT

Batelle was in Knoxville. Had the materials been leased, perhaps the Court would agree with Stinson, but the licenses belonged to Echo MAV, and as intellectual property, the fictional situs for them was the nerve center of the organization.

Based on the record, Echo MAV's *tangible* assets were dispersed between all of its offices; however, at a value of $520,901.62, the tangible assets did not make up the principal assets. *See In re Shelton*, 2001 WL 35814440, at *5 n.15 ("One might theorize situations where a particular asset, though not constituting the majority of the dollar value of the debtor's estate, was of a chief, primary or 'principal' character. But the more logical approach, and less strained reading of the statute, requires a simple determination of where the greater dollar value of all property of the estate is located."), *cited with approval in In re Bavelis*, 453 B.R. 832, 869 (Bankr. S.D. Ohio. 2011) (measuring the debtor's principal assets by looking to where more than 50% of the debtor's assets were located and finding that the intangible asset of a brokerage account was located at the physical location where the account was opened). Instead, Echo MAV's principal assets for purposes of determining venue were its intangible intellectual property, which according to the evidence presented at trial, was collectively valued at more than $3 million. Based on the New Mexico statute, relevant case law, and common sense, the outcome is clear: whether Echo MAV's principal assets were located in New Mexico, as its domicile, or in Texas, its principal place of business (or nerve center), Echo MAV's principal assets were *not* located in Tennessee. Venue, therefore, was not proper in this district.

Under Rule 1014(a)(2), "[i]f a petition is filed in an improper district, the court may dismiss the case or may transfer it to another district [in the interest of justice or for the convenience of the parties]." In this case, the Petitioning Creditors asked for transfer instead of dismissal because of prepetition transfers from Echo MAV to Echo MAV Technologies, Inc.

("EMT"). While there may well have been actually or constructively fraudulent transfers prepetition, that alone was not sufficient for the Court to transfer this case to another district in the interest of justice or for convenience of the parties. Those claims may be litigated in state court (or federal court on diversity jurisdiction). For this reason, the case was dismissed.

## III. PRESUMPTION OF GOOD FAITH

In *In re John Richards Homes Building Co.*, 439 F.3d 248, 254 (6th Cir. 2006), the Sixth Circuit Court of Appeals agreed with the bankruptcy court that "[t]here is a presumption of good faith in favor of the petitioning creditor, and thus the alleged debtor has the burden of proving bad faith." Bankruptcy courts must consider the totality of the circumstances to decide whether an involuntary petition was filed in bad faith. *Id.* at 254-55. The Sixth Circuit recognized in *John Richards Homes* that bad faith, which is not defined in § 303(i), might include using an involuntary bankruptcy to obtain a disproportionate advantage rather than protect collective creditor interests or filing out of malice, ill-will, harassment, or a desire to embarrass the alleged debtor. *Id.* at 255 n.2 (quoting *In re Cadillac by DeLorean & DeLorean Cadillac, Inc.*, 265 B.R. 574, 583 (Bankr. N.D. Ohio 2001)). The inquiry into whether the filing was objectively justified is akin to a Rule 9011 analysis. *Id.*

As the bankruptcy court explained in *In re John Richards Homes Building Co.*, 312 B.R. 849, 857-58 (Bankr. E.D. Mich. 2004), "In determining whether a petitioner has brought an involuntary petition in bad faith, a court is called upon to ascertain the petitioner's motives for filing the petition." Thus, the question is whether the petition was a legitimate collective remedy for creditor risk or, instead, a pretext for a collateral, retaliatory, or coercive objective.

As explained last year by one bankruptcy court:

> Courts evaluating whether creditors filed an involuntary petition in bad faith look at whether the petitioners bore ill will or malice, or intended to harass or

> embarrass the debtor (the "improper purpose" test), or sought to obtain a disproportionate advantage over other creditors (the "improper use" test), or violated Bankruptcy Rule 9011 with the filing. The Petitioners do not fall into any of these categories. They seek to use tools available under law to collect funds allegedly fraudulently transferred from [the alleged debtor] for distribution to creditors. What's wrong with that? Maximizing an estate for distribution to creditors is a fundamental—perhaps the fundamental—bankruptcy purpose. And Congress embedded in the Bankruptcy Code tools to effectuate that purpose. *See United States v. Miller*, 604 U.S. 518, 523 (2025) (avoidance powers "help the trustee maximize the value of the bankruptcy estate by enabling the trustee to recover assets that otherwise would have been lost"). It makes no sense to characterize as "bad faith" actions to invoke a procedure Congress enacted where (as here) it is the only way to maximize the value of an enterprise for the benefit of creditors. Rather, "creditors are justified in filing an involuntary petition where exclusive bankruptcy powers and remedies may be usefully invoked to recover transferred assets, to ensure an orderly ranking of creditors' claims and to protect against other creditors obtaining a disproportionate share of debtor's assets."

*In re Lake Shore Healthcare & Rehab. Ctr. LLC*, 675 B.R. 394, 402-03 (Bankr. N.D. Ill. 2025) (citation modified). The totality-of-the-circumstances approach effectively "looks to both subjective and objective evidence of bad faith." *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 336 (3d Cir. 2015) (citing *In re John Richards Homes*, 439 F.3d at 255 n.2).

Here, the record simply does not overcome the presumption that Horizon filed and the Petitioning Creditors pursued the Involuntary Petition in good faith. The record supports the Petitioning Creditors' assertion that the Involuntary Petition was a measured response to an apparent migration of Echo MAV's business into EMT and not merely an effort by Horizon or Stinson to collect a private debt. The relevant concern is not limited to formal conveyance of title, but the concerns of Horizon were founded in evidence of customer payments shifted to, purchase orders issued by, and orders fulfilled through the new entity, as well as cash transfers from Echo MAV to EMT. Many of these facts came from Echo MAV's own witnesses.

The following facts show that the Petitioning Creditors had reason to be concerned and to seek to employ "exclusive bankruptcy powers and remedies . . . to recover transferred assets, to

ensure an orderly ranking of creditors' claims and to protect against other creditors obtaining a disproportionate share of debtor's assets." *In re Lake Shore Healthcare & Rehab. Ctr.*, 675 B.R. at 402 (citation modified).

- EMT had been created before the petition, and witness testimony placed the transition discussions before the June 12 petition date.
- As acknowledged by Ms. Havir, customer payment instructions were changed so wire and ACH payments would go to EMT. The updated payment guide was dated April 29, 2025.
- Ms. Havir also testified that "Stripe" receipts bearing the Echo MAV name flowed into EMT and EMT received numerous transfers from Echo MAV.[6]
- Echo MAV's purchase orders and vendor activity began appearing under EMT and was externally visible, not merely internal bookkeeping, which could reasonably lead creditors to question whether Echo MAV was retaining assets and revenue sufficient to pay its debts.
- Ms. Havir acknowledged that Echo MAV and EMT used the same phone number, email address, and website, all before the petition was filed.
- Ms. Havir characterized the two entities as "pretty much the same" from her operational perspective. That admission does not establish alter ego or substantive consolidation, but it does materially support a creditor's reasonable concern that

[6] Sprinkle's testimony that the transfers resulted from concern that money in the Echo MAV account could disappear because of alleged conduct by former Echo MAV owner Jeff Knowles might bear on an ultimate fraudulent-transfer question, but it does not show bad faith by the Petitioning Creditors. Instead, it confirms the core point: substantial funds were being moved from Echo MAV to EMT. A creditor could reasonably see that as a risk to Echo MAV's estate and as a reason to seek court-supervised control over cash and property.

ordinary vendors and customers could not reliably distinguish which entity incurred liabilities and which entity received payment.

- Hodges testified that a license arrangement was developed to permit EMT to use Echo MAV intellectual property known as EchoPilot software, which was characterized as a key company asset.
- Vendors had contacted Stinson (their point-of-contact for Echo MAV) about unpaid claims.[7]

Critically, the Petitioning Creditors need not prove that every transfer was legally fraudulent, avoidable, or invalid. Instead, Echo MAV must rebut the presumption of good faith. The evidence, however, reflects that information known to Stinson and Horizon when they acted was based on a good-faith, objectively plausible reason to seek the bankruptcy court's supervision over Echo MAV.

Sprinkle's explanation that the reorganization was for a legitimate business purpose does not eliminate Horizon's reasonable concern when the restructuring was occurring while Echo MAV had major overdue debts and when cash receipts, purchase orders, and use rights were moving to the affiliate. Stinson's knowledge of the stated business rationale for forming EMT is insufficient to rebut the good-faith presumption because a planned restructuring can still create a risk that creditors of the old entity will be subordinated to, or left behind by, the new operating entity.[8]

---

[7] Even if the Court discounts Stinson's testimony because of admitted errors in sworn filings and inconsistent statements regarding DFS, individual claims, paid time off, expenses, and whether the company was insolvent, the transfer-related facts are corroborated by Echo MAV's own witnesses and documents: Ms. Havir, Sprinkle, Hodges, EMT purchase orders, payment-guide emails, Stripe evidence, bank statements, and the license agreement.

[8] The Court finds that Stinson's sometimes inaccurate reference to other creditors about a Chapter 11 case does not rebut the presumption that the Involuntary Petition was filed in good faith, especially when Stinson testified that he believed court oversight could preserve value and understood that a debtor might later seek reorganization. Nor does

The Court, thus, concludes that Horizon[9] did not invoke bankruptcy merely because its note was unpaid. It acted while Echo MAV's business was functionally shifting to a newly created affiliate: customer payments were being redirected, purchase orders were issued by the affiliate, cash was transferred to the affiliate, and intellectual property or software rights were being used through the affiliate. Faced with those facts, a reasonable creditor could believe that ordinary state-court collection would not adequately protect Echo MAV's assets or other creditors. A filing aimed at halting unequal treatment among creditors and preserving an estate is a classic proper bankruptcy purpose.

## IV. ATTORNEYS' FEES & EXPENSES UNDER § 303(i)

### A. Rebuttable Presumption Under § 303(i)

Section 303(i)(1) provides alleged debtors with a remedy if an involuntary petition is dismissed other than by consent, and the plain language of the subsection does not require a bad-faith finding. All that is required is that: "(1) the court must have dismissed the involuntary petition; (2) the dismissal must be other than on consent of the petitioning creditors and the debtor; and (3) the debtor must not have waived its right to recovery under the statute." *In re Anmuth Holdings LLC*, 600 B.R. 168, 184 (Bankr. E.D.N.Y. 2019).

The Petitioning Creditors admit that the majority view among the courts is that § 303(i)(1) creates a rebuttable presumption that an alleged debtor is entitled to attorneys' fees and costs when an involuntary petition is dismissed. [Doc. 112 at 2, 4.] They argue, however, that the totality of the circumstances merits a denial of attorneys' fees and expenses to Echo MAV.

---

the fact that creditors later resolved their vendor-claims retrospectively establish bad faith because the pertinent inquiry focuses on what petitioners reasonably knew and intended when the Involuntary Petition was filed.

[9] As explained, Stinson had direct, personal knowledge that Echo MAV's customer-payment channels, purchase orders, core software rights, vendor relationships, and cash flows were being moved to, used by, or routed through EMT. The other petitioning creditors could reasonably rely on that information and on their own unpaid claims.

[*Id.* at 4-11.] The Petitioning Creditors accurately recite the four factors typically considered under the totality-of-the-circumstances analysis: (1) the merits of the involuntary petition; (2) improper conduct by the alleged debtor; (3) reasonableness of the petitioners' actions; and (4) the petitioners' motivations and objectives. *See In re Higgins v. Vortex Fishing Sys., Inc.*, 379 F.3d 701, 707 (9th Cir. 2004). Notwithstanding their correct statement of the analysis, however, Petitioning Creditors focus on their good faith and the reasonableness of their concerns about Echo MAV's conduct.

Although the Court has found that Echo MAV did not rebut the presumption that Petitioning Creditors acted in good faith, the Involuntary Petition was dismissed because venue was not proper in this Court. Substantial evidence was presented that Echo MAV had meaningful contacts in Tennessee, and considerable evidence existed pointing to Texas as the headquarters of Echo MAV, including that headquarters offices and the officers' home bases were in Lubbock and that bills, customer invoices, and bank statements were sent to Lubbock. Additionally, Echo MAV clearly was organized in New Mexico. Also, the Petitioning Creditors had ample notice of likely factual disputes and that Echo MAV reasonably and stringently would oppose the Involuntary Petition.

Concerning the motivations of Stinson, at least, circumstantial evidence shows that he harbored personal animosity towards Sprinkle. He expressed satisfaction in pressure being placed on Sprinkle, stated he would never work for Sprinkle, portrayed Sprinkle as in default and in serious trouble, discussed with employees and vendors scenarios under which Echo MAV would lose employees and revenue, and spoke negatively about Sprinkle to Echo MAV personnel.

Ultimately, the Court concludes from the totality of the circumstances and a careful review of the evidence presented over four days of trial that the Petitioning Creditors have not rebutted the presumption that Echo MAV is entitled to attorneys' fees and expenses for opposing the Involuntary Petition. The concerns of Horizon before filing the Involuntary Petition simply do not justify refusing reasonable fees and expenses after the Court dismissed the petition in Horizon's chosen forum. Moreover, "any petitioning creditor in an involuntary case . . . should expect to pay the debtor's attorney's fees and costs if the petition is dismissed." *In re MicroStructure Techs. Inc.*, No. 08-44074, 2009 WL 2208590, at *2 (Bankr. W.D. Wash. July 17, 2009) (quoting *In re Kidwell*, 158 B.R. 203, 217 (Bankr. E.D. Cal. 1993)). Under all the circumstances and as a matter of equity, the Court's determination that the presumption has not been overcome "recognizes that filing of an involuntary petition leaves a permanent scar, even if promptly dismissed." *In re John Richards Homes Bldg. Co.*, 552 F. App'x 401, 409 (6th Cir. 2013).[10]

**B. <u>Reasonableness of the Fees and Expenses Sought by Echo MAV</u>**

Section 303(i)(1) "act[s] as a fee shifting statute" and authorizes courts to award a "reasonable" attorneys' fee when an involuntary case is dismissed. *In re Cadena*, 634 B.R. 1038, 1050 (Bankr. C.D. Cal. 2022). To be compensable, fees "must be sufficiently related to the § 303(i) proceeding and reasonable under the circumstances." *Nat'l Med. Imaging, LLC v. U.S. Bank, N.A.* (*In re Nat'l Med. Imaging, LLC*), 644 B.R. 94, 127-28 (Bankr. E.D. Pa. 2022). The rebuttable presumption that the fee award is warranted under § 303(i)(1) "plays no role in"

---

[10] Although the Sixth Circuit rejected the Ninth Circuit's approach to appellate fees and costs after dismissal of an involuntary petition, it did not criticize the Ninth Circuit's conclusion that § 303(i)(1) creates a rebuttable presumption that attorneys' fees and expenses will be awarded after such a dismissal. *In re John Richards Homes Bldg. Co.*, 552 F. App'x at 407-08 (discussing *Higgins*).

determining "whether the fees and costs requested are related to the § 303(i) action and whether the attorney's fees are reasonable." *Id*. at 111.

Fees "should be limited to legal services necessary to support the efficacy of the debtor's § 303(i) claim." *Id*. at 124.

> Section 303(i) is not a vehicle for putative debtors to load up fees against petitioning creditors. The various principles used by courts to delineate between acceptable and unacceptable fee requests are applicable here. Putative debtors should expect to explain why the efforts expended were both useful and of a type ordinarily necessary to advance the § 303(i) proceedings. And of course, a putative debtor's counsel should demonstrate the same level of billing judgment and sensitivity in fee shifting situations as they do with their own private clients.

*Id*. at 124-25 (citation modified).

Additionally, it is within a court's discretion to allocate liability under § 303(i)(1) among petitioning creditors based on the totality of the circumstances; thus, the petitioning creditors may be held jointly and severally liable or may be assessed damages based on each petitioning creditor's conduct. *In re Navient Sols., LLC*, 627 B.R. 581, 593-94 (Bankr. S.D.N.Y. 2021); *see also Linton v. Colpo Talpa, LLC* (*In re Linton*), 631 B.R. 882, 898 (B.A.P. 9th Cir. 2021) ("[Section] 303(i) liabilities may be allocated unevenly among petitioners[,] and . . . common-law doctrines of joint and several liability do not limit the bankruptcy court's discretion to apportion § 303(i) awards."); *Pyke v. Funnel Sci. Internet Mktg., LLC* (*In re Funnel Sci. Internet Mktg., LLC)*, 551 B.R. 262, 276 (E.D. Tex. 2016) (affirming the bankruptcy court's discretionary reduction in and apportionment of fees awarded under § 303(i)(1) against petitioning creditors).

"Section 303(i) and the case law interpreting it do not set forth standards for determining whether and to what extent attorneys' fees are warranted." *In re Navient Sols., LLC*, 627 B.R. at 588. When determining what constitutes reasonable fees under § 303(i)(1), most courts agree that the starting point is the calculation of a lodestar amount. *In re Amrusi,* 674 B.R. 591, 619

(Bankr. E.D.N.Y. 2025) (citing 2 Collier on Bankruptcy ¶ 30.33[4][b], at 303-113 (Richard Levin & Henry J. Sommer eds., 16th ed.) ("At a minimum, the determination of reasonableness involves an assessment of the time spent and the rate charged at the prevailing market rate.")); *see also In re Meltzer*, 535 B.R. 803, 810 (Bankr. N.D. Ill. 2015) ("The statute gives no guidance about what is a reasonable fee, but reasonable attorney's fees in bankruptcy cases are customarily determined using the lodestar method.").

> The reasonableness of the hours expended is a critical lodestar component. In determining the reasonableness of the hours expended, the Court must exclude time that is excessive, redundant, or otherwise unnecessary. At the same time, in doing so, the Court must not penalize attorneys by viewing the efforts of counsel with the benefit of 20/20 hindsight. Hours for an activity or project should be disallowed only where a Court is convinced it is readily apparent that no reasonable attorney should have undertaken that activity or project or where the time devoted was excessive.

*In re Amrusi*, 674 B.R. at 619-20 (citation modified).

The judge who "presided over the bankruptcy for its duration and had the opportunity to evaluate first-hand both the quality of the firm's performance and the contributions made by the firm" also may need to pay "careful attention to the record, including the billing records that support the professional's application," as "it may be necessary to carefully and independently review the attorney time and expense reports to ensure that they were reasonable and commensurate with the tasks undertaken." *Id.* at 620 (citation modified). Accordingly, "in this context, bankruptcy courts enjoy wide discretion in determining reasonable fee awards. In exercising this discretion, the court may call upon its knowledge and experience in similar matters, and in the case at hand." *Id.* (citation modified).

The Court's reasonableness analysis involves multiple considerations.

> The reasonableness of the hourly rate is determined by considering that fee which is customarily charged in the local community by someone who possesses similar skill, experience, expertise, stature and reputation who is faced with similarly novel

> and complex issues and who procures comparable results. Viewed another way, this calls for the Court to consider prevailing market rates for attorneys with comparable skill and standing in the pertinent legal community. [T]he court's review may well also encompass an assessment of the hourly rates of competitors in the marketplace.

*Id*. (citation modified). "At a minimum, the time records submitted should clearly identify the nature of the work performed, its reasonable necessity and relevance to defense of the involuntary petition, and the time expended." *In re Navient Sols., LLC*, 627 B.R. at 588.

Notably, "there is no objective, mechanical, mathematical formula to be applied in determining the reduction of the lodestar [in a § 303(i)(1) analysis]. It is a discretionary determination." *Nat'l Med. Imaging, LLC v. U.S. Bank, N.A.* (*In re Nat'l Med. Imaging, LLC*), Adv. No. 14-250, Adv. No. 14-251, 2023 WL 2246725, at *24 (Bankr. E.D. Pa. Feb. 27, 2023). Indeed, the Court "may use a percentage deduction as a practical means of trimming fat from a fee application." *In re Navient Sols., LLC*, 627 B.R. at 593 (citation modified); *see also Howe v. City of Akron*, 705 F. App'x 376, 383 (6th Cir. 2017) ("[T]he court has approved the across-the-board approach to fee determinations in the past, and we discern no abuse of discretion by the district court in employing that approach in this instance [by reducing the requested fee by 35%].").

Courts have disallowed as unreasonable fees for a party's actions that "only made the . . . process more time-consuming and expensive for all interested parties, . . . were overzealous, were not taken to protect its secured claim, were not cost justified, and were not those that a similarly situated creditor would have taken[, or when the billing invoices reflected] overstaffing, duplication of services, block billing, and insufficient detail." *In re Heritage Hotel Assocs., LLC*, Case No. 8:19-bk-09946-CED, 2021 WL 2646533, at *20 (Bankr. M.D. Fla. June 28, 2021). In *Heritage Hotel Associates*, the Court was "left with the clear impression that [the party seeking

fees] – knowing that [its opponent] would ultimately be responsible for [the] attorney's fees – embarked on an overly aggressive litigation strategy." *Id.* at *20. Additionally, "[i]f the documentation is inadequate, the fee award may be reduced for that reason[, and w]hen, for example, time records are insufficiently specific, or time is lumped or block-billed, the problematic entries may be stricken or the fee reduced by a reasonable percentage." *In re Meltzer*, 535 B.R. at 812 (citation modified).

In *In re Navient Solutions, LLC*, the bankruptcy court reduced as unreasonable the majority of the fees requested under § 303(i)(1) after dismissal of an involuntary petition. The putative debtor's counsel sought $526,954.34 (Kirkland & Ellis LLP) and $81,431.10 (McGuireWoods LLP). *In re Navient Sols.*, 627 B.R. at 585. First, the use of "five partners, four associates and one paralegal," with the partners billing "nearly 200 hours over a month" constituted overstaffing. *Id*. at 592. Second, the court found duplication of services, noting specifically that "[s]ix lawyers on Kirkland's team (including four partners), and all three lawyers on McGuireWoods' team (including one partner and one counsel) attended the MTD hearing." *Id*. Third, the invoices did not list the titles of lawyers and paralegals, did not provide any summary for the fee categories, included "numerous instances of impermissible block billing," and reflected "excessive hours spent on some services, including phone conferences." *Id*.

Finding that the requested fees were not reasonable, the court reiterated that it had "discretion to either reduce the fees or deny the fees in their entirety." *Id*. at 593. In the end, the court awarded $40,797.90 and $16,401.15 for the two law firms, which reflected no fees "for numerous vague entries" and "a further 50% reduction for overstaffing." *Id*. As for requested "costs," the court allowed all filing fees and expenses for court reporters and depositions but

disallowed $1,507.19 for "outside copy, binding, and printing services" that Kirkland did not demonstrate were "reasonable and necessary." *Id*. Finally, the court declined to hold the petitioning creditors jointly and severally liable and, instead, found that the "de facto petitioning creditor," Smith, was liable for all fees incurred before joinder of the other petitioner and all costs; that the joining petitioner was liable for two-thirds of the fees incurred at the hearing on the motion to dismiss, with Smith liable for the remaining one-third; and that each petitioning creditor was liable for fifty percent of all post-hearing fees. *Id*. at 594.

Although not in the context of § 303(i)(1), the Sixth Circuit recently addressed the reasonableness of fees generally in *National Labor Relations Board v. Bannum, Inc*., 102 F.4th 358 (6th Cir. 2024). In response to objections concerning hours expended, failure to provide sufficient detail, block-billing, vagueness, and clerical nature of certain tasks, the court first reiterated that the "starting point for determining the amount of a reasonable attorney fee is the 'lodestar' amount"[11] and that "[t]he party seeking attorney fees bears the initial burden to substantiate the hours worked and the rates sought." *Id*. at 362 (citation modified); *see also In re Village Apothecary, Inc*., 45 F.4th 940, 946 (6th Cir. 2022) ("The party requesting the fees has the burden of proof as to entitlement to and reasonableness of those fees." (citation modified)). Such

[11] As stated by the Sixth Circuit in *Adcock-Ladd v. Secretary of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000), trial judges are authorized to "adjust the 'lodestar' to reflect relevant considerations peculiar to the subject litigation" in consideration of twelve factors.

> These factors are: (1) the time and labor required by a given case; (2) the novelty and difficulty of the questions presented; (3) the skill needed to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Id*. at 349 n.8 (citations omitted). The court also "must provide a concise but clear explanation of its reasons for the award [and] . . . should state with some particularity which of the claimed hours the court is rejecting, which it is accepting, and why." *Smith v. Serv. Master Corp*., 592 F. App'x 363, 366 (6th Cir. 2014) (citation omitted).

substantiation requires that "the documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation." *Bannum*, 104 F.4th at 362 (citation modified). The documentation "need not record in great detail how each minute of an attorney's time was expended, but the general subject matter of his time expenditures should be identified," and fees may be reduced accordingly for inadequate documentation. *Id*. at 362-63 (citation modified).

Starting with block billing, which is the "grouping together of multiple tasks without specifying how much time each task took," the court stated that the practice "is not *per se* improper; it can be sufficient if the description of the work performed is adequate." *Id*. at 364 (citation modified). The court then expounded on what constitutes sufficient descriptions:

> [E]xplicitly detailed descriptions in billing statements are not required. Counsel must instead provide the general subject matter of the task, such that [the court] can determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation. Descriptions such as "preparing" and "editing" . . . may be brief, but they provide the general subject matter – i.e., the motion at issue – as well as what the attorney was doing. This provides sufficient detail for [an] analysis.

*Id*. (citation modified); *see also Howe*, 705 F. App'x at 383 (affirming the trial court's reduction of fees by 35% after the trial court "gave Plaintiffs' counsel the benefit of every doubt but nonetheless determined that their bills reflect a severe lack of care, evidenced by the many entries "listing a string of activities using only the most general of descriptors . . . leaving the court to guess as to the nature of each task." (citation modified)); *In re Vaughn*, 660 B.R. 827, 856-57 (Bankr. S.D. Ohio 2024) (holding that courts may disallow *in toto* services that have been "combined, or [impermissibly] lumped with other tasks so that the Court can[not] discern whether a reasonable amount of time was spent performing that task." (citation modified)).

Detailed descriptions between attorneys and clients or between attorneys, however, "need not include details of what the lawyers discussed." *Bannum, Inc.*, 102 F.4th at 365. Additionally, "[t]here is no hard-and-fast rule as to how many hours lawyers can spend discussing a project," and courts can read the billing entries "in the context of the billing statement as a whole and in conjunction with the timeline of the litigation." *Id*. (citation modified).

Finally, the Sixth Circuit panel addressed the objection that requested fees were for clerical tasks that were not compensable, stating the following:

> "[P]urely clerical or secretarial tasks should not be billed" at the same rate as pure legal work. *Missouri v. Jenkins*, 491 U.S. 274, 288 n.10 (1989). Though this court has never explicitly defined clerical work, we have previously described it as "non-professional work" and "ministerial" in nature. *In re Hayes & Son Body Shop, Inc.*, 958 F.2d 371, 1992 WL 56754, at *3 (6th Cir. 1992) (per curiam) (unpublished). In *B & G Mining, Inc. v. Director, Office of Workers' Compensation Programs*, an administrative law judge reduced a bill for "receiving, reviewing and filing correspondence" on the basis that some of that work was "primarily clerical in nature." 522 F.3d 657, 666 (6th Cir. 2008). We affirmed the hours awarded, holding that although "reviewing correspondence can constitute legal work, receiving and filing correspondence presumably constitutes clerical work." *Id.* Our sibling circuits have likewise defined clerical work by example, holding that clerical work includes delivering, picking up, and photocopying documents, *In re Meese*, 907 F.2d 1192, 1203 (D.C. Cir. 1990) (per curiam), filing and organizing documents as well as obtaining transcripts, *Nadarajah v. Holder*, 569 F.3d 906, 921 (9th Cir. 2009) (per curiam), "sending and receiving faxes, requesting and receiving medical records, serving papers, and hand-delivering courtesy copies of filings to the courthouse," *Lilly v. City of New York*, 934 F.3d 222, 234 (2d Cir. 2019), and "faxing, emailing, filing, scanning, assembling, and conforming," *McKenna v. City of Philadelphia*, 582 F.3d 447, 457 (3d Cir. 2009). Pure clerical work, as these examples indicate, does not require legal knowledge.

*Id*. at 366.

The court expressly found that "filing motions and preparing exhibits are not purely clerical," agreeing that "preparing exhibits entail[s] a meticulous selection and organization process, grounded in deep understanding of the legal framework and the strategic imperatives of the case" and that "filing motions in our online filing system requires the legal knowledge to

appropriately categorize legal documents [and] is not akin to hand-delivering courtesy copies of filings to the courthouse or filing correspondence in a filing cabinet." *Id*. (citation modified). The court further stated that filing documents "is deemed to be the act of the attorney" under the Sixth Circuit's Guide to Electronic Filing, and although an attorney, who receives training to file documents electronically, may authorize staff to use his or her registered user login and password and delegate the task, "[b]ecause electronic filing requires legal knowledge, and because the court permits only attorneys to serve as registered users of the ECF system and attorneys are liable for any electronic filings done using their login credentials, electronic filing through the ECF system cannot be considered purely clerical." *Id*. at 366-67; *but see id*. at 368 ("Filing is still a clerical task. . . . Most actions that take place in a law office are done on behalf of lawyers. But that does not mean lawyers can recover for every licked envelope or trip to the printer. In sum, lawyers should not bill for the ten minutes it takes to file a pleading simply because they use computers." (Nalbandian, J., dissenting)).

Applying these principles to the billing in this case causes the Court to deem it necessary to materially reduce the fees for nonlocal premium rates, block-billed and mixed-purpose work, and unreasonable travel time. The Court also reduces the expert and related expenses, as explained below.

Echo MAV's counsel, Dickenson Wright ("DW"), seeks $426,730.97 for 644.01 hours, a blended hourly rate stated as approximately $662.62. The major timekeepers are:

| **Timekeeper** | **Claimed Rate(s)** | **Hours** | **Approximate Fees** |
|---|---|---|---|
| Stephen Montgomery | $560 / $605 | 311.43 | $177,774.50 |
| Ethan Hastert | $855 / $925 | 219.63 | $194,197.57 |

| | | | |
|---|---|---|---|
| Jordan Garsson | $420 | 74.21 | $31,170.30 |
| Kristen Hudson | $720 / $780 | 20.44 | $14,793.60 |
| Brianna Hammons | $405 | 13.20 | $5,346.00 |
| Other members | $630–$730 | 5.10 | $3,449.00 |
| Total: | | 644.01 | $426,730.97 |

The request also includes $41,154.82 in expenses, including $16,143.70 in travel, food, lodging, and parking; $13,884.40 for the expert; $3,891.05 for court-reporter fees; $2,375.30 for deposition transcripts; and $4,814.50 for trial transcripts.

The Petitioning Creditors argue that the maximum hourly rate should be $325. Such a reduction, however, would ignore case complexity, DW's existing relationship and familiarity with Echo MAV, and a client's right to select qualified counsel. Still, the Court finds DW's argument for charging nonlocal, premium hourly rates to be lacking in sufficiently strong market evidence. Thus, the Court will apply a 15% across-the-board rate-equivalent reduction as part of an overall percentage reduction rather than assignment of artificial replacement rates to each attorney. The Court considers that this method recognizes DW's expertise and existing relationship, the importance and complexity of the litigation, the absence of detailed independent local-rate proof, and the premium imposed by the Nashville and Chicago rates in a Knoxville case.

The billing itself can be separated into the following general categories of work: the motion to dismiss; written discovery on creditor identity, asset location, and statutory qualifications; five depositions of Petitioning Creditors' representatives and defense of five fact witnesses, plus an expert deposition; a four-day evidentiary hearing across December and February; trial preparation involving extensive exhibits, declarations, witness examinations, and

rapidly changing joinder and witness issues; and a substantial creditor-list dispute and pretrial exhibits/witness disputes.

The Petitioning Creditors compare the 644-hour request to the 357.55 hours expended by their own counsel. Each side bore different burdens, chose different staffing patterns, and handled different evidentiary tasks. Also, DW had to defend the business and prepare its witnesses. In other words, the legal work is not subject to an apples-to-apples comparison.

Still, a significant amount of DW's billing is problematic and merits reduction. The following items cause concern:

- Several entries (e.g., on September 23 and 24) expressly combine bankruptcy strategy with "concurrent litigation," "district court cases," or other remedies against Stinson and/or Horizon.
- The motion to quash subpoenas was denied, and some entries are block-billed with other work.
- Concerning deposition preparation, more than 10 hours were billed for preparation of three company witnesses plus additional entries on deposition days combining preparation, witness conferences, defense, follow-up, and document review.
- Redundancy exists from the use of multiple senior lawyers to confer on strategy (i.e., Hudson, Anderson, Eres, Yitzchaki, Montgomery, and Hastert all appear in portions of the case).
- Billed travel time includes entries of 7.31, 5.89, and 10.20 hours, as well as multiple travel billing for Nashville-to-Knoxville travel that otherwise was unproductive.

- Researching and coordinating potential local counsel may be reasonable in small measure, but some entries are tangential.
- Some work was performed on an "outlier claim" and settlement research that is not clearly tied to the defense of the petition.
- Numerous entries bundle conferences, document review, drafting, client communications, legal research, and strategy with no allocation.

Given the volume of the billing, the Court finds that a percentage reduction is the best method. Accordingly, the Court will impose the following reductions:

| **Reduction Reason** | **Basis** | **Amount** |
|---|---|---|
| Rate adjustment | 15% of requested fees | $64,018.65 |
| Global hours reduction for record-wide timekeeping concerns, including numerous block-billed and multi-task entries; mixed-purpose / district-court work; duplication among senior lawyers; mixed travel/preparation/deposition entries; local counsel search work; entries that combine deposition preparation, client conferences, document review, attendance, and follow-up; and an unsuccessful motion to quash, particularly when it cannot be separated from other tasks | 20% of requested fees after 15% reduction for rate adjustment | $72,542.46 |
| **Total attorney-fee reduction** | | **$136,561.11** |

This reduction of $136,561.11 represents the Court's equitable discretion under § 303(i)(1), including the Petitioning Creditors' good-faith concern about transfers, the nonfrivolous nature of some disputed issues, and the fact that Echo MAV did not rebut the presumption of good faith.

The Court also deems necessary a reduction of expenses for the expert witness and for travel, lodging, meals, and parking. Although the work of the expert witness was reasonably related to the issue of bad faith so that it was not frivolous to engage an expert, the 21 hours of travel time plus mileage and overnight expenses for one day of testimony are not fully justified on this record.

The main reason for the Court's determination about the expert expenses is that on questioning at the trial, the expert could not explain how it was appropriate to ascribe to Stinson the clearing of the "Trusted Platform Module" ("TPM") on Stinson's Echo MAV laptop that the expert forensically inspected because a photograph provided to the expert of the image on the screen after Stinson left the building would have been different if Stinson had cleared the TPM, which would have made all the files on the device unrecoverable. The expert witness was clear that the photograph of the screen image meant that the user had not yet cleared the TPM when the photograph was taken.[12] [Doc. 94 at 187.] He also testified that he could not conclusively say that Stinson had deleted any Echo MAV assets that were critical to operations and did not exist anywhere else. [*Id.* at 214.] Given his testimony, the Court finds it appropriate to reduce allowance of the expert expenses by 50% (or $6,942.20).

---

[12] The Court questioned the expert witness about whether the image on the screen would indicate that Stinson did not press the required key to clear the TPM before the photograph was taken, and the witness agreed. [Doc. 94 at 168.]

> Q: How, then, can we ascribe to Mr. Stinson, who no longer, he didn't touch this laptop. No evidence he touched this laptop again after Mr. Castor saw this image, how do we ascribe to him that he actually . . . cleared the TPM?
>
> A: I see. Okay. So because we don't have the follow-on screenshot, we can't make the –
>
> Q: If you assume Mr. Stinson never touched the computer again after this image was taken.
>
> A: Yes, ma'am. The only evidence I have of that would be that the Windows device is no longer encrypted when it was previously.

[*Id.* at 169.]

Finally, the Court finds it appropriate to reduce some of the travel expense included in DW's billing statements. First, the Court will disallow the following travel expenses:

| Date | Description | Reason for Disallowance | Amount |
|---|---|---|---|
| 1/7/2026 | Business Meal Expense | Mr. Hastert's 1/7/2026 billing does not reflect any need for travel on that date. | $181.13 |
| 1/7/2026 | Travel Expenses | Same as above | $1,889.48 |

Second, the travel expenses for Echo MAV's employees (Ms. Havir, Sprinkle, Hodges, and Nate Garrison) are not properly compensable to counsel. Instead, they are costs of Echo MAV that likely would have been recoverable as damages if Echo MAV had rebutted the good-faith presumption. That DW paid the travel expenses for Echo MAV's employees does not make them compensable. Accordingly, the sum of $10,459.42 for the Echo MAV employees' travel expenses is disallowed.

Thus, the expenses sought in the total amount of $41,154.82 will be reduced by $19,472.23 for a total expense reimbursement authorization of $21,682.59. The total authorized fee award plus expense reimbursement is $311,852.45.

The Court finds it appropriate to apportion the fee award between the Petitioning Creditors based on the number of days that each petitioning creditor was a party, as follows:

- Horizon, as the initial petitioner, is jointly and severally liable for the entire amount of $311,852.45.
- DFS, which joined the petition on October 22, 2025, and was a petitioning creditor for 114 of 246 days, or 46% of the total time, is jointly and severally liable with Horizon and Rosenthal for $143,452.13.

- Rosenthal, which joined the petition on October 22, 2025, and was a petitioning creditor for 114 of 246 days, or 46% of the total time, is jointly and severally liable with Horizon and DFS for $143,452.13.
- Stinson, individually, who joined the petition on December 4, 2025, and was a petitioning creditor for 71 of 246 days, or 29% of the total time, is jointly and severally liable with Horizon, DFS, and Rosenthal for $90,437.21.
- Fuqua and Lyons, who joined the petition on December 8, 2025, and were petitioning creditors for 67 of 246 days, or 27% of the total time, are jointly and severally liable with Horizon, DFS, Rosenthal, and Stinson for $84,200.16.

## V. CONCLUSION

In summary, the Court finds that Echo MAV failed to rebut the presumption that the Petitioning Creditors acted in good faith in filing the Involuntary Petition, and the Petitioning Creditors failed to rebut the presumption that Echo MAV is entitled to attorneys' fees and expenses under § 303(i)(1). The result is that Echo MAV is not entitled to damages but is entitled to attorneys' fees and expenses, albeit in a reduced amount that the Court finds reasonable under the totality of the circumstances. Thus, a judgment will enter in favor of Echo MAV and against the Petitioning Creditors in the amounts detailed above.

FILED: September 30, 2026

BY THE COURT

*s/ Suzanne H. Bauknight*

SUZANNE H. BAUKNIGHT
UNITED STATES BANKRUPTCY JUDGE